We will hear argument first in number 20, 2078 In Re Parallax Group International. Mr. Sells? Van Loben Sells, right? Van Loben. Begin whenever you are ready. Good morning and may it please the court. My name is John Van Loben Sells and I represent the patent owner, Parallax, in its appeal from the Patent Trial and Appeal Board's ruling following the reexamination of the Parallax 085 patent. With me today is my colleague, Joe Andelin. As the court is aware, in the underlying reexamination, the examiner found that all claims of the 085 patent were obvious under Section 103 of the Patent Act, and the board ultimately adopted the examiner's rationale. For that result, appellant, the 085 patent owner, demonstrated in its papers that the board committed a reversible error when it endorsed the examiner's fatally flawed invalidity analysis. Specifically, the examiner rejected all the claims of the 085 patent as obvious under Section 103 solely because she concluded that the two layers of the Koffler mat inherently have the same coefficient of thermal expansion. Counsel? C.T., yes. I want to ask you a question about that. I understand that it was an inherency argument, but wasn't there an obvious misposition as well in that Golorm taught the idea of using, having the same coefficient of thermal expansion between two materials in order to solve the problem that the patent was seeking to solve? Yes, well, I understand that that's the board's position on appeal, that there was an obvious argument based on that combination, but in fact, the examiner below did not make that rejection. There is no combination. The examiner didn't cite Golorm at all? She did cite Golorm, but she cited it for a different proposition. She cited it for the proposition that it supported her conclusion that the missing feature in Koffler was actually inherently present, and that's different. That's different from admitting that the feature is missing in Koffler and present in Golorm and that they may be combined, and if it is our position, had the examiner meant to make a combination rejection, that she knew how to do that. There is a specific way to do that, and that she had to set out, specifically under KSR and its progeny, all the reasons why that combination would result in an obvious misrejection. She didn't do that. But you agree that the board did? I do not. If you look at the board's final decision, the only place where it cites this Koffler in combination with Golorm is on page six of its final decision, which is at appendix page eight. And there, the board essentially adopted the exact same rationale as the examiner and proved what the examiner said about it, which is that Golorm informs or supports the notion that that feature is inherently a part of Koffler. The board does not make a separate rejection based on that combination, and in fact, it could not do so under. What do you make of the sentence that says, therefore, this is the sentence coming right after Golorm, the skilled worker had reason at the time of the invention to pick the conditions which would result in the layers having the same thermal properties and to only use those that do. I guess I had understood that to be that Golorm gives the motivation, even if not every single thing within the Koffler range would produce the required equal coefficients of thermal expansion to pick the conditions that would. Well, I agree that it appears that the board is saying that, but I think that what it cannot do is support the decision of the examiner and affirm the rejection if the rejection was not made on that basis, because there has to be. Your view is that that would be a new grounds of rejection, which you then would be able to have sent back to the examiner if he chose. That's exactly right. So what happens in a situation where the board has what you consider to be a new grounds of rejection, but doesn't treat it as a new grounds of rejection, do you then have the burden of telling the board that they made a mistake, for example, on a petition for re-hearing? Well, I haven't seen authority that would suggest that we have the obligation to do that before bringing an appeal here. No, you have a choice. I believe if you have a choice, you could either go directly, when there is a new ground of rejection, you could either go directly to this court still, or you could choose to continue prosecution in front of the examiner. Okay, well, we obviously chose to bring the appeal directly here because that is our view of what appears to have happened here or what may have happened here to the extent that the board treated the citation to Gilorme as a combination. That was an improper additional grounds for rejection that is not in the examiner's final rejection. And her final rejection is on page 1814 of the appendix, where she's very clear in how she cites it. She cites it as support for her inherency argument, and that's what it is. I think we understand your position. You probably have other more important things you wanna talk about, so I don't wanna keep you from talking about the other parts of the examiner's rationale and the board's rationale. Right, so thank you, Your Honor. So I guess what I would say sort of in response to Your Honor's initial question is that let's say that that obviousness rejection was properly made or properly taken into account in the board's final action. I think it still has to be reversed here because as we pointed out in our papers, where you have disparate types of prior art references, like Gilorme and Koffler are not the similar technology. They're not the same technology. They're very different. Gilorme deals with printed circuit boards. Koffler deals with this sort of polymetric foam. They're very different. And when you have different technologies like that, then the board or the examiner, if there had been a combination rejection, had to have pointed to evidence outside of those two references in order to find motivation to combine. So in other words, if you have references that are similar. What about the fact that the references are directed to the same problem? Well. At least one of them, they're both seeking to solve, the secondary reference, Gilorme, is directed to solving a specific problem that one of our examiners in the art knew of to exist in the first reference. Well, I guess at a high level of generality, that would be true, that you have a problem of potential delamination and heat stress, but you're talking about that happening in very different chemical, physical environments. The Gilorme reference deals with printed circuit boards and resins, and they don't have any of the sort of volatility, or at least there's no evidence that they have the sort of volatility that you have with polymetric foams and that sort. And so when you have- There's a discussion of the problems that you just mentioned with respect to the foams, because I didn't really see that in the specification. You know, all the discussion about how you have to have the rollers be a particular temperature, all of that, or you'll have these problems of being able to achieve the same coefficient of thermal expansion in the two different materials. Well, I guess what I would say, Your Honor, I don't have the specific references that I might point to from the specification, but I'll get those from my colleague and bring them back in rebuttal. But one response to that question is that, you know, we've cited cases for the proposition that it's not proper for the board to criticize the specification for not having answers to every conceivable invalidity challenge that might arise. You know, that that's not an appropriate criticism of the specification. The specification doesn't have to have all the information that's needed to traverse hypothetical rejections, and ours certainly doesn't. But, you know, we have and have to have the opportunity to traverse rejections when they are made expressly, and in this case, certainly we believe that that rejection was not made expressly. I guess, I don't really see it as being that way. You've got this critical sentence, I think, in your specification that says, the two layers have the same chemical composition so that two layers may have the same coefficient of thermal expansion. And it seems now that you're presenting evidence that this, in fact, the statement in the specification isn't necessarily true. And instead, there's a lot more to it than that. It's a lot more difficult than the specification makes it sound. Well, Your Honor, I think the response to that is that that sentence in the specification deals with foamed layers. So the chemical composition of the foam that has already gone through the reactions and the foaming process. In those cases where they have the same chemical composition, then yes, they have the same CTE. But the problem arises, and the Koffler reference deals with situations where you have the same chemical ingredients beforehand. It doesn't take into account what happens during the foaming process, the chemical reactions that happen there, the off-gassing, the changes into the molecular structure and density of the foam that happen necessarily when you are doing that process. So we're really talking about different things. You're talking about the same matte layers, yes, when they have the same chemical composition because they've gone through that process in the same way, they do have the same CTE, but they don't have it automatically when you start just with the same ingredients because you have to control. So if I understand correctly, that you're reading of the chemical composition is things like cell structure, cell size, density. That's how you're reading chemical composition as opposed to what the materials are that it's made of. That's correct. It's not simply the ingredients. Especially because in the foaming process, the ingredients change. They indisputably undergo chemical change. Even the quantities of the constituents change because there is this off-gassing that happens when the foaming process takes place. So they're not the same when they finish as when they start. So the chemical composition has to include density, the molecular structure, all those things, cell size, because those play into the physical properties of the foam mat layers, including CTE. Yes. Why aren't things like cell structure and cell size themselves physical properties? They are physical properties. But you're calling them chemical compositions. Well, I think that they go hand in hand. I think the chemical composition, the chemical structure feeds into the cell size. They feed into the density because the chemicals are rearranged during the foaming process. And when you read that sentence that is cited by the board in the final action, it's cited out of the context of the rest of the specification that does talk about it. You are into your rebuttal time? Of course. Of course. Save that. I gotta go. I'm gonna shoot. Yeah, you gotta do both of them, especially this one. Okay, thanks. Mr. Solwert, did I pronounce that correctly? Yes. Good morning, and may it please the court, Peter Solwert on behalf of the USPTO director. The board's conclusion that the pending claims of the 085 patent would have been obvious over the prior art is correct, and the underlying factual findings are supported by substantial evidence. Well, what about, let's just call it a procedural argument, this idea, which I think Mr. Van Lomansels suggested, that the board, to the extent it went beyond saying, same CTE is inherent in Koffler, went off in a different direction from anything found in the examiner's rejection, and that was improper. Yes, Your Honor. I would start by saying that that argument wasn't raised in the opening brief before this court, it's only raised in the reply brief for the first time, and so it's improper.  As noted in the PTO's brief, at APPX 1813 to 1814, the examiner's final rejection discusses 103, and specifically discusses the combination of Koffler and Galorme, and the PTAB opinion cites APPX 1814 for that very proposition at APPX 6 and 8. It may be that there are several different uses that could be made of Galorme. What if one of them would be, Galorme tells a skilled artist, this is all 103, there was never any 102, so the question is, what is a skilled artisan gonna do with Koffler? One thing is this inherency point, which is everything Koffler teaches produces the CTE if you use the same ingredients, true inherency. I took it that the page, I guess appendix page eight, written decision page six, says kind of even if not, Galorme tells a skilled artisan to set conditions, not just pick ingredients, use conditions to ensure that CTEs are the same. Where on 1813, 1814 does the examiner speak of choosing conditions that would produce CTE if not every same ingredient mixture would? There is a sentence that says use the right ingredients near the bottom of, this is line 17 to 19 of 1814, but that doesn't speak of conditions like temperature, which is I think what the other side focuses on. Correct, Your Honor. So reading these sentences together, I think is how you come to that outcome. It says a person having ordinary skill in the art would use materials with the same physical properties such as coefficient of thermal expansion and laminate foam materials to avoid delamination. That's the starting point that Your Honor mentioned, starting from just Koffler, that a person of ordinary skill in the art would use the same ingredients and because they are meant to be the same, process them under the same conditions and therefore they would wind up with the same physical properties. But then the examiner goes on to say, this is supported by Galorme, which teaches that by having a composition with a coefficient of thermal expansion that is substantially the same as that of the substrate to which it is applied, serious problems of delamination are overcome. So the examiner is saying that Galorme teaches the person of ordinary skill in the art that you not only need to apply the same conditions, but you need to particularly control for the outcome of the coefficient of thermal expansion. That is the critical parameter that has to be kept in mind during the process. Did the examiner and the examiner's answer elaborate in any way that would move this discussion, which on the assumption of this discussion, doesn't quite get to process conditions. Did the examiner's answer talk about process conditions? No, Your Honor, because Parallax's appeal brief only talks about inherency, I believe that the examiner limited her discussion to a rebuttal of the appeal brief. And so that issue wasn't raised for the examiner to further clarify to the extent it was unclear from this passage. And certainly the board, as I noted at pages six and APPX six and eight, the board's opinion is citing to this precise page for the precise proposition that we've just discussed that to the extent that inherency isn't present based on coffee alone, one of ordinary skill, looking to the same problem to solve this problem of delamination would be aware of galore and would know that the critical parameter to control for is the coefficient of thermal expansion. And that would take steps to control the process to get the desired outcome of the same CTE for both bone layers. And as the board found, that's consistent with the disclosure in the 085 patent, both in the passage that Judge Stoll pointed out and also in the brevity of the disclosure, there's less than two columns of detailed description of the embodiment of the invention. And so it's largely left to the skill of a person of ordinary skill in the art to come up with, well, what temperature should I use? What ranges should I control them to? What equipment should I use? If all of these things are so critical, that's sort of post hoc reasoning by parallax. Now, it wasn't disclosed, it evidently wasn't their viewpoint at the time that they filed the patent because none of that description is present. In fact, there's far more information for a person of ordinary skill to start from in creating a controlled process when looking at Koffler than looking at the 085 patent. Because the 085 patent, for example, says the roller temperature should be controlled to within five degrees, but it doesn't tell you to within five degrees of what, whereas Koffler provides starting ranges. And it doesn't say that that- I'm sorry, I guess I had understood the five degrees to mean you're doing two rolls, they should be within five degrees of each other. Is that, did I misunderstand that? That's correct, Your Honor, but I'm pointing out that- absolute temperature, just no variation greater than five. Did I misunderstand that? I think similar to that, Your Honor, I would, from my point of view, it would be something like, you would discover that your very idealized temperature for conducting a particular step is 185 degrees. And so that means plus or minus two and a half degrees is your range that you want to control because that's the ideal that you're shooting for, but you don't want to let it get more than two and a half degrees either side of that. My point I was trying to make is that they're telling you not to let it go more than two and a half degrees away, but they don't tell you it's 185 degrees. The person of ordinary skill in the art has to figure out that idealized number that's gonna be the center point of that range all on their own, because it's not identified in the 0I85 patent. Again, this person of ordinary skill in the art is quite highly skilled because of all of the factors that go into producing these foamed products. Thank you. I'll also say that the task before this court is greatly simplified because- Can I say one more thing on this procedural? If Parallax thought that the board's decision had introduced a new ground of rejection, was it obligated to seek rehearing? Or can it come to us as an initial matter and say, put aside whether it did say that, and it's open and brief here, separate question, is it obligated to seek rehearing of the board? I think it behooves the patentee to take advantage of that process, but they're not, strictly speaking, obligated to do so. There are definitely procedures and rules in place for raising that specific issue, that a new ground of rejection- I vaguely recall that there is some rule about that, but I don't remember. Do I have it right that the rule is, is that if there is a new ground of rejection, only if there is, like if the board recognizes it, then the rule says that the patent applicant can either go directly to our court or go back to the patent examiner for further prosecution. Do you know? But it has to be in a situation where the board has in fact said that there's a new ground. That is correct, Your Honor. The board first has to recognize that there is a new ground of rejection, which entails asking them to consider that issue. I would like to add that I think that the- If one put aside all of this obviousness version of the board's decision and just asked the question, was the board right in saying that sameness of the CTE is inherent in what Koffler teaches? Defend that. Yes, Your Honor. I think that that's an entirely defensible position because Koffler specifically teaches that you're creating these two batches of color, that you're using the exact same ingredients and subjecting them to the exact same processes. And I think it's a matter of common sense, at least as a starting point, that if you put in the exact same ingredients except for the color, and you subject those mixtures to the same processes under the same conditions, you will get products that have the exact same properties. You have to either change the- Where's the best portion in Koffler that says same conditions, same process? Well, I think it's in that example, number 17, for example, which starts on APPX-2021, it's described as two or more separate batches, each with a different color. That's at line 30 on APPX-2021. But all of the steps for those two batches are exactly the same. So- There's not a separate- Some of those, just tell me if I've misunderstood this. You have studied this more than I have. So some of the conditions, like temperature conditions, are fairly substantial ranges. I'm looking at 110 to 130, 100 to 130, 80 to 100, 160 to 175. If in round number one, say, you had 100, and in round number two, you had 130, would you inherently get the same CTE out of the two results, even though there's a 30% difference in the temperature? I don't know the answer to that question, Your Honor. I don't think there's- Isn't that a problem, that one doesn't know the answer to that question? No, I don't mean a lawyer problem. I mean, it's a substantive problem for determining inherency. I don't believe so, Your Honor, because I don't think that's a fair way to read the disclosure in COPLAR. The fact that it is saying, for example, mix the two kilogram lumps at 80 to 100 degrees C, that is akin to telling you a starting point to identify my example of the 185 degree number. Your idealized point, they suggest, will fall in that range. That's a good segue, but there's something else besides the example 17, something that might apply, in fact, to all examples, say, whatever you do for rule number one, do exactly the same for rule number two. Not precisely, Your Honor, because example 17 is the one that has two batches precisely to produce the two colors. That's what makes it unique. There are many other examples, but I'm not aware of one in particular. There are many, many in here that there's a reason to do it in two separate batches. I see. And just to finish that point, Your Honor, I think these are identifying starting points for identifying your idealized process control point. They are not saying you can have it during the process, vary anywhere in that range, and I don't think that from any art, including chemistry, that's a reasonable way to read a manufacturing process, which always identifies a target value to control the process, and then moves from that to identify how much variance there can be in order to produce the desired high-quality product. Every manufacturing process, in order to be successful, wants repeatability, and part of repeatability is process control, sort of just a basic tenet of all manufacture, and I think you have to read the example 17 with that in mind. It's giving you more information than the 085 patent gave you, as a person of ordinary skill, to start your investigation of how am I going to set up this process, but it still has to be refined and optimized according to the ordinary skill in the art. I'd just like to add briefly, Your Honor, that I think that the issues before this court are greatly simplified because many of the arguments raised in Parallax's brief were not raised before the board, and the starting point for this court's consideration should be 37 CFR 41.37 C1.4, which states that argument or authority must be included in the brief to be considered, and also states that any claims that aren't separately argued rise or fall together, and any separate argument is specifically waived, and that, so Parallax was on very clear notice that not raising the argument in its brief, not in an attachment or in somewhere in the record, to the board would result in waiver of those issues, and as I've noted, there are additional issues that Parallax has raised for the first time in its reply brief that were not even raised in its opening brief to the court, and I don't believe that there's any reason of fairness or due process to allow those arguments to stand. Court has no more further questions. Thank you. And Mr. Van Loven-Sells-Freeman. Thank you, Your Honor. I just had a couple of follow-up points. One, to follow up on an answer that counsel gave to your question, Your Honor, about whether inherency has been proved or supported by the board, and I think you latched exactly onto it that they have not done that, that if you look at the details of Koffler, and you follow what Koffler has, you do not end up with two mats coming out with the same CTE, especially with that broad of a range of temperature controls. At least there's no evidence that the board cites to, or that the examiner could have cited to, that would support that proposition, and it is the board's burden to prove inherency on that point, because at least the examiner was solely relying on it to prove invalidity here. So if there is no evidence that the board can point to, the only evidence in the record is what Parallax submitted with its expert declarations that show exactly the opposite, that this is a very volatile process, and that even when you have exactly the same or very close to the same ingredients coming in, if you don't closely control the phoning conditions, including temperature, then you don't end up with mats that have the same or similar CTE. So we believe that the inherency argument absolutely fails on, for substantive reasons, and the combination argument, to the extent that there is one, has to fail at least on substantive due process grounds, or procedural due process grounds, because the examiner did not present it as a ground for rejection, and they had to do it. So at that last point, where in your blue brief did you make that point? Which, your honor? The point that the board moved beyond inherency to talk about a motivation of a skilled artisan to choose certain process conditions that with the same ingredients would produce the same CTE. Where did you make the argument in your blue brief that it was improper for the board to do that because the examiner had not done it? I'm not sure that we raised that exactly in our opening papers, but we do cover it in our reply brief. That's a problem, right? Well, hopefully not, your honor. I mean, from our perspective, I think it is an issue of due process for our client, that our client would have had the opportunity to traverse that rejection had it been made. Certainly we believe that the art is non-analogous and we had the opportunity, if we did, to traverse that, we could have. And at a minimum, that the board failed to cite evidence of motivation to combine outside of the two references, which this court's cases say that it has to do when you have non-analogous art. Thank you, thank both parties for your arguments. The case is submitted.